151 F.3d 918
 98 Cal. Daily Op. Serv. 5653, 98 Cal. Daily
Op. Serv. 7641,
98 Daily Journal D.A.R. 7641
Thomas Martin THOMPSON, Petitioner-Appellant,
v.
Arthur CALDERON, Warden of the California State Prison at
San Quentin, Respondent-Appellee.
 No. 97-99018.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 9, 1998.
Decided July 11, 1998.
Amended July 13, 1998.
Second Amendment July 28, 1998.
 
 Gregory A. Long, Sheppard, Mullin, Richter & Hampton, Los Angeles, California; Quin Denvir, Federal Defender, Sacramento, California; and Andrew S. Love, Coffin & Love, San Francisco, California, for the petitioner-appellant.
 Holly D. Wilkens, Deputy Attorney General, San Diego, California; Daniel E. Lungren, Attorney General, Sacramento, California, for the respondent-appellee.
 Appeal from the United States District Court for the Central District of California; Dickran M. Tevrizian, Jr., District Judge, Presiding. D.C. No. CV-89-3630-RG.
 Before: HUG, Chief Judge, BROWNING, SCHROEDER, FLETCHER, REINHARDT, KOZINSKI, O'SCANNLAIN, T. G. NELSON, KLEINFELD, TASHIMA, and THOMAS, Circuit Judges.
 Opinion by Chief Judge HUG; Concurrence by Judge KOZINSKI; Concurrence by Judge KLEINFELD; Partial Concurrence and Partial Dissent by Judge REINHARDT; Partial Concurrence and Partial Dissent by Judge TASHIMA.
 HUG, Chief Judge.
 
 
 1
 JUDGE BROWNING, JUDGE SCHROEDER, JUDGE FLETCHER, JUDGE REINHARDT, JUDGE TASHIMA, JUDGE THOMAS concurring in Parts I, II, III, and IV, and JUDGE BROWNING, JUDGE SCHROEDER, JUDGE FLETCHER, JUDGE THOMAS concurring in Part V. JUDGE BROWNING, JUDGE SCHROEDER, JUDGE FLECTCHER, JUDGE KOZINSKI, JUDGE O'SCANNLAIN, JUDGE T.G. NELSON, JUDGE KLEINFELD, JUDGE THOMAS concurring in the judgment. JUDGE REINHARDT and JUDGE TASHIMA dissenting from part V and from the judgment.
 
 I.
 
 2
 The procedural history, evidence, and facts in this case are set out in the Supreme Court's opinion reversing our decision to recall the mandate. Calderon v. Thompson, --- U.S. ----, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). Therefore, we will limit our discussion of the procedural history to the events related to Thompson's motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b).
 
 
 3
 On July 23, 1997, while the motion to recall the mandate was pending before the en banc court, Thompson filed a motion in district court pursuant to Fed.R.Civ.P. 60(b), seeking relief from this court's judgment denying him habeas relief under subsections (b)(2), (b)(3), and (b)(6). Treating the motion as the functional equivalent of a second habeas petition, the district court denied the motion on the grounds that, under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(b)(3)(A), Thompson must obtain authorization from this court before filing a second petition. The district court issued a certificate of probable cause and Thompson timely appealed. Pursuant to Circuit Rule 22-3(a)(3), the appeal was assigned to the en banc court.[1]
 
 
 4
 On August 3, 1997, this court filed an en banc opinion sua sponte recalling the July 11, 1997 mandate and vacating the previous panel decision on the basis of the claims and evidence presented in Thompson's first federal habeas petition; not based on any new evidence or new claims raised in his motion to recall the mandate. Thompson v. Calderon, 120 F.3d 1045 (9th Cir.1997) (en banc). We then dismissed without prejudice Thompson's appeal from the district court's denial of his Rule 60(b) motion as moot. Thompson v. Calderon, 122 F.3d 1184 (9th Cir.1997).
 
 
 5
 The Supreme Court granted certiorari and reversed our decision to recall the mandate, Calderon, at ----, 118 S.Ct. at 1506, and remanded with instructions to reinstate the July 11, 1997 mandate denying habeas relief to Thompson. We reinstated the mandate and granted Thompson's motion to reinstate his appeal from the district court's denial of his Rule 60(b) motion.
 
 
 6
 The State of California sought and obtained a warrant for Thompson's execution for July 14, 1998, prior to the completion of our briefing schedule on the 60(b) appeal. We ordered expedited briefing and heard oral argument on July 9, 1998.
 
 II.
 
 7
 Thompson sought relief from judgment under Fed.R.Civ.P. 60(b)(2), (b)(3), and (b)(6).[2] Thompson alleges that evidence discovered after the disposition of his federal habeas petition establishes that David Leitch returned to the apartment Thompson and Leitch shared while Fleischli was alive, and that Leitch saw Thompson and Fleischli engaged in consensual intercourse and then left the apartment. Thompson claims that these facts were disclosed by Leitch to the State prior to Thompson's trial and to Leitch's Parole Board in 1995 while the first petition for habeas corpus was pending before the district court and that the State engaged in misconduct in failing to disclose this exculpatory evidence.
 
 
 8
 As noted, the district court denied relief on the basis that Thompson's Rule 60(b) motion was required to be treated as a second or successive habeas corpus application and that he had failed to petition this court for an order authorizing the district court to consider such an application as required by 28 U.S.C. § 2244(b)(3)(A).
 
 
 9
 A district court's denial of a 60(b) motion is typically reviewed for an abuse of discretion. Lynch v. Blodgett, 999 F.2d 401, 402-03 (9th Cir.1993). However, the district court's conclusion that the 60(b) motion had to comply with the successive petition requirement of the AEDPA is an issue of law that we review de novo. United States v. Kim, 105 F.3d 1579, 1581 (9th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 353, 139 L.Ed.2d 274 (1997) (district court authority determinations are reviewed de novo ).
 
 
 10
 Several circuits have articulated the rationale in favor of treating Rule 60(b) motions in habeas cases as successive petitions governed by § 2244(b)(2). See United States v. Rich, 141 F.3d 550, 551-52 (5th Cir.1998) (citing cases where Rule 60(b) motions were treated as successive petitions). For example, in Felker v. Turpin, 101 F.3d 657, 661 (11th Cir.1996), the Eleventh Circuit noted, "Rule 60(b) cannot be used to circumvent restraints on successive habeas petitions. That was true before [the AEDPA] was enacted, and it is equally true, if not more so, under the new act." This reasoning is consistent with the Supreme Court's observation in McCleskey v. Zant, that "a petitioner can abuse the writ by raising a claim in a subsequent petition that he could have raised in his first, regardless of whether the failure to raise it earlier stemmed from a deliberate choice." 499 U.S. 467, 489, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).
 
 
 11
 A review of our case law reveals instances, prior to the enactment of the AEDPA, where a petitioner sought relief from judgment pursuant to Rule 60(b) which were construed as successive petitions. In Bonin v. Vasquez, 999 F.2d 425 (9th Cir.1993), we held that attorney neglect is insufficient to warrant review of additional claims under Rule 60(b) which could have been raised in an initial habeas petition. Id. at 427-31. Similarly, in Clark v. Lewis, 1 F.3d 814 (9th Cir.1993), we refused to consider a Rule 60(b) motion based on subsequent intervening case law. Id. at 825-26.
 
 
 12
 In most cases when the factual predicate for a Rule 60(b) motion also states a claim for a successive petition under 28 U.S.C. § 2244(b), as it does in this case, the Rule 60(b) motion should be treated as a successive habeas petition. This is consistent with general habeas corpus jurisprudence, for a "Rule 60(b) motion following the entry of a final judgment in a habeas case raises policy concerns similar to those implicated by a second petition...." Bonin, 999 F.2d at 428.
 
 
 13
 Thus, we agree with the district court's conclusion that Thompson's 60(b) motion must be treated as a successive petition governed by the AEDPA. We do not foreclose the possibility, however, that under a different factual situation a 60(b) motion filed after denial of an initial petition for habeas corpus would not have to comply with the AEDPA's successive petition requirements.[3]
 
 III.
 
 14
 Having concluded that the 60(b) motion must be treated as a successive petition and Thompson having requested that the appeal of the denial of the 60(b) motion be treated alternatively as a request for authorization to consider the application for a successive petition, the question is whether this is a matter properly before the en banc court to determine. Section 2244(b)(3) as amended by the AEDPA provides:
 
 
 15
 (A) Before a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application.
 
 
 16
 (B) A motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three-judge panel of the court of appeals.
 
 
 17
 (C) The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.
 
 
 18
 (D) The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.
 
 
 19
 (E) The grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari. 28 U.S.C. § 2244(b)(3)(A)-(E).
 
 
 20
 The obvious question is whether under (B) only a three judge panel can consider whether to authorize the district court to consider this 60(b) motion, since it must be treated as a second or successive application for a writ of habeas corpus.
 
 
 21
 The appeal of the 60(b) motion is currently before the en banc court. As is so often the case, decisions must be made immediately before an impending date of execution. Certainly, if at all possible, a decision upon whether a successive application should be granted and a stay issued should be decided on the merits rather having a person executed because of time constraints and procedural niceties.
 
 
 22
 The Fourth Circuit in In re Vial, 115 F.3d 1192, 1193 (4th Cir.1997), convened an en banc court to consider a request for permission to file a second or successive motion to vacate a prisoner's sentence pursuant to 28 U.S.C. § 2255, which involved the application of the same requirements of the AEDPA provisions. In this case, the en banc court already has before it the appeal of the denial of the 60(b) motion.
 
 
 23
 The en banc court could remand to the three judge panel that considered the original habeas petition to determine whether consideration of the 60(b) motion is authorized. This would be a waste of judicial resources. The grant or denial of the authorization would be subject to sua sponte review by the en banc court empaneled to hear this case. Although § 2244(b)(3)(E) provides that "the grant or denial of an authorization by a court of appeal to file a second or successive application shall not be appealable and shall not be subject to a petition for rehearing or for a writ of certiorari," the language does not preclude sua sponte review by an en banc court. It merely precludes the parties from seeking a rehearing. See Triestman v. United States, 124 F.3d 361, 367 (2nd Cir.1997). Triestman involved a three judge panel sua sponte ordering a rehearing, but the principle is equally applicable to an en banc court sua sponte ordering a rehearing. The court stated:
 
 
 24
 The parties also agree that, notwithstanding the restrictions on appealability in § 2244(b)(3)(E), this court has the authority to order a rehearing sua sponte. It is well-established that a court of appeals is entitled both to reconsider a prior decision sua sponte, see, e.g., United States v. Melendez, 60 F.3d 41, 44 (2d Cir.1995), vacated in part on other grounds, 516 U.S. 1105, 116 S.Ct. 900, 133 L.Ed.2d 834 (1996), and to order a rehearing sua sponte, see, e.g., Krimmel v. Hopkins, 56 F.3d 873, 874 (8th Cir.), cert. denied, 516 U.S. 1015, 116 S.Ct. 578, 133 L.Ed.2d 501 (1995). By mandating that the initial decision of the court of appeals "shall not be the subject of a petition for rehearing" (emphasis added), § 2244(b)(3)(E) provides only that a disappointed litigant may not ask the court to reconsider its certification decision. By its plain terms, it does not purport to limit the court's own power to review its decisions or to undertake a rehearing. As such, the government concedes, and we agree, that under the AEDPA, a court of appeals retains the authority to order a rehearing sua sponte.
 
 
 25
 Id.
 
 
 26
 Judge Kleinfeld's opinion expresses the fear that there could be manipulation as to whether the three judge panel or the en banc court makes the authorization decision. This fear is unfounded because the en banc court designated to hear this Thompson case would always be in a position to review sua sponte the decision of the three judge panel.
 
 
 27
 This appeal of the denial of the 60(b) motion is currently before us. The appeal can reasonably be considered as a motion for authorization and the en banc court can reasonably be considered to have the authority to make the decision. This enables our court to reach the merits within the time constraints engendered by the impending date set for execution. Although other procedures could be employed, they would involve the likelihood of granting a stay or the unfortunate prospect of never reaching the merits before the date of execution.
 
 IV.
 
 28
 We have concluded that Thompson's appeal from the district court's denial of his Rule 60(b) motion must meet the requirements of a successive petition under the AEDPA. We also have concluded that Thompson's request for authorization to file a second petition is properly before this en banc court. Accordingly, we must decide whether a successive petition under 28 U.S.C. § 2244(b) as amended by the AEDPA may be used to challenge a death sentence, when the newly proffered evidence relates to guilt of the offense constituting the special circumstance and not to guilt of the homicide. We interpret the AEDPA's amendments to § 2244(b) to permit a petitioner, in a successive petition, to establish that he is ineligible for the death penalty.
 
 
 29
 Prior to the enactment of the AEDPA, the Supreme Court articulated an "actual innocence exception" to the bar arising from the doctrine of "abuse of the writ" against bringing claims in a successive habeas petition. This exception requires that "one must show by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." Sawyer v. Whitley, 505 U.S. 333, 336, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). Because Thompson presents new evidence regarding the rape conviction, the lone special circumstance that made him eligible for the death penalty under California law, his request to file a successive petition is undoubtedly encompassed by the Sawyer standard.
 
 
 30
 In amending § 2244(b), Congress adopted language similar to that articulated in Sawyer, requiring newly discovered facts which, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).
 
 
 31
 We note the difference between the two standards-"eligible for the death penalty" under Sawyer, and "guilty of the underlying offense" under § 2244(b)(2)(B)(ii) as amended by the AEDPA. We consider this difference in determining whether, because Thompson is not asserting actual innocence of the homicide, but rather his ineligibility for the death penalty, he is stating a claim upon which relief may be granted. In effect, we must decide whether the scope of the "actual innocence" standard articulated in Sawyer has been superseded by a narrower exception in the AEDPA. Under a narrower reading, an anomalous situation could be created where Thompson could challenge his rape conviction in a successive petition but, even if the conviction were overturned, he could not challenge his death sentence.
 
 
 32
 Under the canons of statutory construction, the similarity of the language between Sawyer and § 2244(b)(2)(B)(ii) potentially cuts both ways. On the one hand, the fact that the standards are nearly identical suggests that Congress intended to codify the Sawyer standard. On the other hand, the slight difference between the two could be read as suggesting that Congress intended just the opposite: to enact a provision similar to but more stringent than the Sawyer standard.
 
 
 33
 However, unlike Sawyer, the standard in § 2244(b) applies to all habeas petitions, not just capital habeas petitions. For that reason, it would not have made sense for Congress to adopt, without any changes, the Sawyer standard referring to eligibility "for the death penalty," since the statute would have to apply to cases where the petitioner did not receive the death penalty. Thus, the need to cover non-capital habeas petitions best explains the slight difference in wording between the Sawyer "actual innocence" standard and § 2244(b)(2)(B)(ii).
 
 
 34
 Furthermore, the "underlying offense" in a death penalty case is capital murder rather than merely homicide. Under Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and its progeny, the special circumstances or aggravating factors making a defendant eligible for the death penalty must be particularly alleged in the indictment. Thus, by claiming the constitutional infirmity of the lone special circumstance that made him eligible for the death penalty, Thompson is challenging his conviction of the "underlying offense" of capital murder.
 
 
 35
 Because the words "underlying offense" encompass a charge of capital murder and because of the likelihood that the difference in the language between the Sawyer standard and new § 2244(b)(2)(B)(ii) was to accommodate non-capital as well as capital habeas petitions, we hold that Thompson's claim that he is ineligible for the death penalty due to the constitutional infirmity of the rape conviction, which stands as his sole special circumstance, states a claim under § 2244(b).[4]
 
 V.
 
 36
 Since Thompson has stated a claim for which relief may be granted under § 2244(b), we must apply the standard of review articulated in that statute in determining whether to authorize the filing of a successive petition in the district court. Section 2244(b)(2)(B) provides that a prisoner may not file a successive petition in district court unless:
 
 
 37
 (i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
 
 
 38
 (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
 
 
 39
 28 U.S.C. § 2244(b)(2)(B). A court of appeals "may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application" satisfies the standard in § 2244(b)(2). 28 U.S.C. § 2244(b)(3)(C); accord Woratzeck v. Stewart, 118 F.3d 648, 650 (9th Cir.1997). Thompson fails to make a prima facie showing of the requirement under § 2244(b)(2)(B)(ii).
 
 
 40
 The Supreme Court in Calderon v. Thompson stated that the evidence before it was not enough to meet the Sawyer standard. --- U.S. at ---- - ----, 118 S.Ct. at 1503-04. Specifically, the Court recounted that there was evidence of intercourse with Thompson, "extensive evidence of restraint," "injury to her right wrist with surrounding bruising .... consistent with injuries caused by handcuffs," "other bruises on her ankles, palms, left elbow, and left wrist, all of which were caused at or near the time of death," and that "Fleischli's shirt and bra had been cut down the middle and pulled down to her elbows, exposing her breasts and restraining her arms" and her "mouth had been gagged with duct tape." Id. at ----, 118 S.Ct. at 1503. When Thompson was arrested in Mexico he had handcuffs in his pocket.
 
 
 41
 The Court also suggested that Fleischli's murder was evidence that she had been raped, and noted that "[t]wo jailhouse informants, though discredited to a substantial extent at trial, testified that Thompson had confessed the rape (as well as the murder) to them." Id. at ---- - ----, 118 S.Ct. at 1503-04. Finally, the Court repeated the district court's observation that "Thompson's own testimony 'was devastating to his defense,' " suggesting that "since Thompson lied about almost every other material aspect of the case, the jury had good reason to believe he lied about whether the sex was consensual." Id. at ----, 118 S.Ct. at 1504.
 
 
 42
 The Court recognized that we had not considered the allegations in Thompson's Rule 60(b) motion. See id. at ----, 118 S.Ct. at 1504. Thus, the Supreme Court's analysis explicitly did not include the evidence now before us regarding Leitch's statements. Nevertheless, we hold that Thompson has not made a prima facie showing that this additional evidence, viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found Thompson guilty beyond a reasonable doubt of rape, which was the sole aggravating factor supporting the death penalty.
 
 
 43
 By "prima facie showing" we understand [it to be] simply a sufficient showing of possible merit to warrant a fuller exploration by the district court.... If in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition, we shall grant the application.
 
 
 44
 Woratzeck v. Stewart, 118 F.3d 648, 650 (9th Cir.1997) (citing Bennett v. United States, 119 F.3d 468, 469 (7th Cir.1997)).
 
 
 45
 In considering whether a prima facie case exists, it is important to consider the strength of the evidence that Leitch ever made these statements and the likelihood they would be credible to a jury. Furthermore, even assuming he made the statements and they were true, whether they would have any likelihood of establishing that Thompson was actually innocent of the rape in light of the overwhelming evidence to the contrary is not clear. The affidavits of persons who related what Leitch said were not only hearsay but related conflicting stories. The only statement by Leitch himself that has been produced is one that he made in his 1995 parole hearing after the Thompson trial, but while the first habeas petition was pending. He stated "when I came in the apartment earlier, it looked like somebody were [sic] having sex out in the middle of the apartment, so I left, and I came back later." He also said she wasn't screaming. Later in the proceeding, in clarifying where Thompson and Fleischli were located at the time, he affirmed that it was just about the same place she was killed. Then the presiding officer asked "I think there is some implication here that he might have killed her because he wanted to force himself on her sexually and she resisted. But you don't know that that's the case, right?" To which Leitch responded "No, I don't."
 
 
 46
 This minimal evidence that Leitch observed Thompson and Fleischli having sex at the spot on the floor where she was ultimately killed and wasn't screaming provides little support for a claim of actual innocence by Thompson, especially since his claim was that the consensual sex occurred on the bed. Fleischli's body was found with duct tape over her mouth. This would provide an easy explanation for why there were no screams. It is also significant that this statement at the 1995 parole hearing conflicts with his statements at parole hearings before and after, in which he stated that Thompson had raped Fleischli. It also conflicts with the statement he made to his ex-wife, Tracy Leitch shortly after Fleischli's death, that Thompson had "probably tried to rape [Fleischli], and she wouldn't go for it." The inconclusive character of this evidence forecloses any reliance upon Leitch's statements as a basis for relief.
 
 
 47
 Thompson also relies on the statement of Floyd Owens who had been employed as a deputy sheriff and was involved in the Fleischli murder investigation. He furnished an affidavit concerning his recollection of his responses when interviewed by an investigator and an attorney for Thompson in 1997. He states in the affidavit:
 
 
 48
 2. I retired from the Sheriff's Department before the case against Thomas Thompson and David Leitch proceeded to preliminary hearing. Since moving to Nevada in August of 1982, I have not made any effort to remain informed regarding the matter. My deposition was taken by Thompson's attorneys on February 6, 1992, regarding the investigation of the Fleischli rape/murder. I found it difficult being deposed about the case in 1992, due to the passage of time. Not surprisingly, my recollection has not improved with time.
 
 
 49
 ....5. When I spoke to Thompson's investigator and Mr. Denvir, about the crime scenario they asked me about, and indicated the source of the version may have been Leitch, I was referencing the transcripts of his statements when he was arrested. Leitch had given three or four versions of what had happened, so it is difficult for me to remember almost 16 years after the fact what those versions had been. At the time I spoke to Mr. Denvir and his investigator I did not believe, and did not intend to convey, that Leitch told me directly any version of the crime other than those stated in his initial interview after his arrest.
 
 
 50
 Owens' affidavit fails to establish that Leitch conveyed a consistent account of his observations on the night of the murder. The fact that Leitch may have related a version of consensual sex among several other versions provides little support for Thompson's claim of actual innocence.
 
 
 51
 An affidavit by Tamar Todd, a paralegal employed by the public defenders office, stated she would testify that she met with Leitch in 1997 in prison and Leitch told her that on the night in question he saw Thompson and Fleischli have sex on the floor in the square main room of the apartment, that there was nothing to indicate that Thompson was raping Fleischli, and that Leitch believed they were having consensual sex.
 
 
 52
 Andrew Love, an attorney for Thompson, submitted an affidavit that Leitch's former attorney, Ronald Kreber, now Judge Kreber, told Love in 1997 that Leitch had informed him prior to Leitch's trial that on the night Fleischli was killed he had returned to the apartment he shared with Thompson, saw Fleischli and Thompson having consensual sex, and then left.
 
 
 53
 There is little doubt that Leitch did tell a story to some persons that he observed Thompson and Fleischli having sex on the floor where she was ultimately killed, and that on some occasions he said he thought it was consensual. It is also true that Leitch, on several occasions, said he believed Thompson raped Fleischli. The credibility of his various stories is in serious doubt, the nature of his observations is questionable, and conflict with Thompson's statements about where he had consensual sex with Fleischli seriously diminish any impact that Leitch's statements could have.
 
 
 54
 In light of the evidence viewed as a whole, Thompson fails to present a prima facie case that he could establish through "clear and convincing" evidence that no reasonable factfinder could have found him guilty of capital murder. For these reasons, we deny his request for authorization to file a successive habeas corpus petition in the district court.
 
 
 55
 The district court's denial of the Rule 60(b) motion is AFFIRMED. Pursuant to 28 U.S.C. § 2244(b)(3)(A), request for authorization to file a successive petition is DENIED. Thompson's request for a stay of execution is DENIED.
 
 
 56
 KOZINSKI, Circuit Judge, concurring in the judgment, with whom O'SCANNLAIN, Circuit Judge, joins:
 
 
 57
 I join that portion of Judge Kleinfeld's concurrence (the second, third and fourth full paragraphs on page 930) that recognizes the full court never voted to take en banc Thompson's motion for authorization to file a successive habeas petition.
 
 
 58
 Further, the full court never voted to consider en banc case No. 97-99018, Thompson's appeal from the denial of his Rule 60(b) motion. Nor were the procedures of Circuit Rule 22-3(a)(3) followed. This court's July 30, 1997, order announces that the majority of the active judges had voted to take en banc Nos. 95-99014 and 95-99015; there is no mention of No. 97-99018. The case is therefore still properly pending before the three-judge panel. Our August 3, 1997, order dismissing No. 97-99018, and our May 13, 1998, order reinstating it, were ultra vires.
 
 
 59
 Because I believe we have no authority to speak, I say nothing further.
 
 
 60
 KLEINFELD, Circuit Judge, concurring in the judgment, with whom O'SCANNLAIN and T.G. NELSON, Circuit Judges, join, and with whom KOZINSKI, Circuit Judge, joins in part:
 
 
 61
 I concur in the result the majority reaches, that Thompson has not demonstrated an entitlement to any relief in this proceeding. I also agree with the majority that Thompson has not submitted evidence that would entitle him to authorization to file a second or successive petition. But I would not reach that issue, because our eleven judge en banc panel would have no authority to grant the authorization even if we thought Thompson had presented sufficient evidence to be entitled to it.
 
 
 62
 Thompson filed what Congress calls a "second or successive application" in the United States District Court. He sought a federal writ of habeas corpus addressed to his California state conviction and death penalty. That he styled his papers a motion for relief under Federal Rule of Civil Procedure 60(b)(2), (3), and (6), does not enable him to avoid the statutory limitations on second and successive applications.
 
 
 63
 Thompson had previously petitioned for a writ of habeas corpus in district court and his case had gone to final judgment. He had prevailed in district court on a theory of ineffective assistance in counsel, but we reversed and ruled that a writ would not issue. Thompson v. Calderon, 109 F.3d 1358 (9th Cir.1997). Thompson petitioned for certiorari, it was denied, Thompson v. Calderon, --- U.S. ----, 117 S.Ct. 2426, 138 L.Ed.2d 188 (1997), our mandate issued and the district court entered judgment.
 
 
 64
 A week later, Thompson filed new papers seeking a federal writ of habeas corpus to obtain relief from his state confinement and death sentence. He claimed that newly discovered evidence that he did not rape Ginger Fleischli, and prosecution failure to disclose the new evidence to him during and after his trial, entitled him to a writ. Though Thompson styled his papers as a motion under Federal Rules of Civil Procedure 60(b)(2), (3) and (6), rather than as a petition for a writ of habeas corpus, that does not entitle him to avoid the limitations of 28 U.S.C. § 2244(b) on "a second or successive application."
 
 
 65
 I doubt there could be any form of papers seeking, as a practical matter, federal relief from a state conviction and sentence, after federal relief had previously been denied, that would not fall within the statutory provisions governing second or successive applications. In Clark v. Lewis, 1 F.3d 814, 825 (9th Cir.1993), we said that "where a habeas petitioner tries to raise new facts or new claims not included in prior proceedings in a Rule 60(b) motion, such motion should be treated as the equivalent of a second petition for writ of habeas corpus." Likewise in Nevius v. Sumner, 105 F.3d 453, 461 (9th Cir.1996), we treated a motion to recall a mandate as a subsequent petition for a writ of habeas corpus, because to do otherwise would be to evade the strictures of McCleskey v. Zant, 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), and the Antiterrorism and Effective Death Penalty Act of 1996.
 
 
 66
 Even if there might be a category of second or successive applications for federal relief from state criminal confinement and death sentences not covered by 28 U.S.C. § 2244(b), this application would not fall within it. Thompson sought habeas corpus relief based on a claim of innocence of an aggravating circumstance and prosecutorial misconduct. These are grounds ordinarily and frequently asserted in habeas corpus petitions, and unquestionably covered by the statutory restrictions on second and successive petitions.
 
 
 67
 In its decision reversing our sua sponte recall of the mandate from our earlier decision, the Supreme Court said that the precise claim before us today would be a second or successive application limited by 28 U.S.C. § 2244(b). The Court said "had the court considered claims or evidence presented in Thompson's later filings, its action would have been based on a successive application, and so would be subject to § 2244(b)." Calderon v. Thompson, --- U.S. ----, ----, 118 S.Ct. 1489, 1500, 140 L.Ed.2d 728 (1998). Though the statement was dicta because the Court did not use it to resolve any issues in dispute, Thompson's argument that we should not do as the Court said cannot be accepted. Thompson argues that to the extent his motion in district court was based on fraud under Federal Rule of Civil Procedure 60(b)(3), the policy of prohibiting successive petitions to avoid manipulative withholding of claims does not apply. But the statute applies to second and successive applications regardless, as the Supreme Court has said in this very case.
 
 
 68
 Congress has established the procedure to be used for second and successive applications, as this is, in the Antiterrorism and Effective Death Penalty Act of 1996. The Act states that "[b]efore a second or successive application permitted by this section is filed in the district court, the applicant shall move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). Thompson did not move in this court for an order authorizing the district court to consider his application. Because he did not obtain an order authorizing the district court to consider the application, as required by 28 U.S.C. § 2244(b)(3)(A), the district court dismissed the application. The statute plainly required the district court to do exactly what it did. That should be the end of this case. We should simply affirm the dismissal on the ground that Thompson had not obtained an order authorizing him to file his second or successive application in district court, so the district court lacked jurisdiction to act on it under 28 U.S.C. § 2244(b)(3)(A).
 
 
 69
 There is no reason to think that Thompson made a mere technical error or error of form. He has been very skillfully counseled by excellent lawyers, and may well have made a tactical decision to proceed as he did. Had Thompson moved for authorization to file his second or successive application, his motion would have gone to the same three judge panel that had previously heard his case. See Circuit Rule 22-3(a)(3). That panel had reversed the district court's grant of the writ, Thompson v. Calderon, 109 F.3d 1358 (9th Cir.1997), and denied his motion to recall its mandate, Thompson v. Calderon, 122 F.3d 28 (1997). That panel expressly instructed in its published order that "[p]etitioner may file a second petition for habeas corpus after moving this court for authorization under 28 U.S.C. § 2244(b)(3)(A)." Id. at 30.
 
 
 70
 The majority today considers Thompson's request for § 2244(b) authorization on the merits and denies it. While that would be the correct decision, were we entitled to reach the merits, we are not. My disagreement with the majority regarding jurisdiction may affect future cases, so is worth setting out.
 
 
 71
 Thompson did not make a motion in this court for authorization. He filed a notice of appeal in district court, from the order denying his motion for relief from judgment under Federal Rule of Civil Procedure 60(b). Thompson did not seek appellate authorization to file a second or successive application until after we had, in an eleven judge en banc panel order, required supplemental briefs. Only then, in his concluding sentence, Thompson asked us to vacate and reverse the district court decision, "or, in the alternative, authorize the district court to consider Petitioner's successor petition."
 
 
 72
 If Thompson's request in his brief amounts to a motion under Federal Rule of Appellate Procedure 27, then it has to go to a three judge panel. The reason is that Congress said that "[a] motion in the court of appeals for an order authorizing a second or successive application shall be determined by a three-judge panel of the court of appeals." 28 U.S.C. § 2244(b)(3)(B). Statutes get no clearer than that. We are eleven. "Three" does not mean the same thing as "eleven." An eleven judge en banc panel cannot grant or deny a motion for leave to file a second or successive application, because 28 U.S.C. § 2244(b)(3)(B) says "three-judge panel."
 
 
 73
 Thompson argues that the legislative history shows that when it said "three," all Congress meant was "more than one." His citation is to a remark by Senator Specter that "Because the courts of appeals act in panels of three judges, two judges will have to agree that a subsequent petition satisfies the rigorous standards of this bill before it is filed in the district court." Cong. Rec., June 7, 1995, S7805 (remarks of Sen. Specter). This legislative history provides no support for the argument, for several reasons. First, the Senator did not even mention en banc proceedings and was not discussing them, so inferring that he meant to allow them is unwarranted speculation. The Senator appears to have been speaking to the risk of a single idiosyncratic appellate judge acting in error. Second, individual senators do not make laws; majorities of the House and Senate do. See Puerta v. United States, 121 F.3d 1338, 1344 (9th Cir.1997). Finally, there is no ambiguity in the statute that would entitle us to resort to legislative history to figure out how to interpret away the ambiguity. Fernandez v. Brock, 840 F.2d 622, 632 (9th Cir.1988).
 
 
 74
 "Three" is among the plainest words Congress can use. If we could construe "three" to mean "eleven," imagine what we could do with "two." The Constitution says "two Senators from each State," Art. I, § 3. But because construing "two" to mean "two" would conflict with evolving standards of "one person one vote," perhaps we could construe "two" to mean "no fewer than two," allowing for perhaps "seven" Senators from a large state.
 
 
 75
 The majority takes the position that anything a three judge panel can do, an en banc panel can do. Generally that is true, but not in this case. The statute regarding second and successive applications, 28 U.S.C. § 2244(b)(3)(B), says "three-judge panel," and § 2244(b)(3)(E) says the three judge panel's decision "shall not be appealable and shall not be the subject of a petition for rehearing." Those words in the statute exclude the possibility that we may proceed in the ordinary way to rehear matters en banc, or hear them initially en banc. We have held that 28 U.S.C. § 2244(b)(3)(E) requires us to dismiss a suggestion for rehearing en banc as unauthorized. See United States v. Lorentsen, 106 F.3d 278, 279 (9th Cir.1997).
 
 
 76
 The majority construes the statutory prohibition on "petition for rehearing" to leave room for sua sponte rehearing en banc. In our decision recalling the mandate, reversed by the Supreme Court, we had avoided the statutory restraints in § 2244(b) on second habeas petitions by proceeding "sua sponte" on Thompson's first habeas petition. See Thompson v. Calderon, 120 F.3d 1045, 1049 (9th Cir.1997) (en banc), reversed on other grounds --- U.S. ----, 118 S.Ct. 1489, 140 L.Ed.2d 728. But proceeding sua sponte can at most avoid the § 2244(b)(3)(E) prohibition of "petition" for rehearing. Acting without a petition cannot avoid the § 2244(b)(3)(B) command that a motion "shall be determined by a three-judge panel."
 
 
 77
 We generally have authority under 28 U.S.C. § 46 to order initial hearing or rehearing of any matter en banc. But it is elementary that a more recent and specific statute is reconciled with a more general, older one by treating the more specific as an exception which controls in the circumstances to which it applies. 2B Sutherland on Statutory Construction § 51.02 (5th ed.1992). The more recent and specific statute says "three-judge panel." Thus it is plain that there is an exception to our general authority to hear any matter en banc, where the matter is a motion for authorization to file a second or successive application. Congress could have so provided in order to avoid the greater delays inherent in considering any matter before a larger panel.
 
 
 78
 The majority bases its contrary conclusion on Triestman v. United States, 124 F.3d 361, 367 (2d Cir.1997) and In re Vial, 115 F.3d 1192 (4th Cir.1997) (en banc). But those cases do not establish the point. Triestman holds that the statutory prohibition of "a petition for rehearing" does not limit a court's power sua sponte to rehear a matter. But the sua sponte rehearing in Triestman was by the three judge panel that had previously heard the matter, not a larger panel, so the court had no occasion to consider the statutory command that motions for authorization "shall be determined by a three-judge panel." 28 U.S.C. § 2244(b)(3)(B). Because Triestman construed subsection (E) and not subsection (B), it is not on point. Because Triestman involved a three-judge panel's sua sponte rehearing of its own decision, and not en banc hearing or rehearing, it establishes no precedent for en banc rather than three judge panel hearing or rehearing.
 
 
 79
 In Vial, the Fourth Circuit convened en banc to consider a request for permission to file a second or successive application. All thirteen judges sat, so the case is indeed precedent for sua sponte consideration by an en banc panel of more than three, as the majority says. But Vial should be distinguished, for two reasons. First, the case does not cite subsection (b)(3)(B) and does not discuss at all the question whether a panel of more than three judges would comply with the statute. Because the question appears not to have arisen, the Fourth Circuit cannot be taken to have answered it.
 
 
 80
 Second, a peculiarity of our circuit gives the difference between a three judge panel and an en banc panel a different meaning from what it has in the Fourth Circuit or any other. Our en banc courts consist of the chief judge and ten additional judges drawn by lot. Circuit Rule 35-3. For that reason, en banc hearing or rehearing consists of a different set of judges, both from a three judge panel, and from the entire court. This difference allows for manipulation of a case to gamble on a more favorable panel for one side or the other, if we do not carefully comply with applicable statutes, rules and general orders. On the Fourth Circuit, where Vial came down, there is no difference between the en banc court deciding something, and the full court deciding that the en banc court ought to decide something. But in the Ninth Circuit there is a big difference. We currently consist of 21 active judges, but only 11 sit on an en banc panel. For that reason, in the Ninth Circuit, judges not drawn for an en banc panel can affect what the en banc panel considers only when they vote on whether to take the case en banc. A majority of the court, necessary to take a case en banc, consists of 11, but a majority of an en banc panel consist of only 6, and cannot usurp the authority of the full court to decide which cases to take en banc.
 
 
 81
 Because a "case" may be heard en banc only on a vote of the entire court, the majority is mistaken when it asserts that "the en banc court designated to hear this Thompson case would always be in a position to review sua sponte the decision of the three judge panel." "Cases and controversies" may be taken en banc only if "ordered by a majority of the circuit judges of the circuit who are in regular active service." 28 U.S.C. § 46(c). But the full court has never voted to take this case on banc.
 
 
 82
 When we voted to go en banc last July, Thompson had not even made a motion for authorization to file a second or successive application. He did not do so until we, as an en banc panel, ordered supplemental briefing after the Supreme Court reversed our earlier sua sponte recall of our mandate. As we stated in our order taking Thompson's earlier case en banc, "[t]he full court has voted to consider whether to recall the mandate to consider whether the panel decision of our court would result in a fundamental miscarriage of justice." Thompson v. Calderon, 120 F.3d 1042, 1043 (9th Cir.1997). Our decision recalling the mandate sua sponte recited that the full court had "voted to reconsider en banc whether to recall the mandate." Thompson v. Calderon, 120 F.3d 1045, 1048 (9th Cir.1997) (en banc).
 
 
 83
 We stated expressly in our previous en banc decision that the case at issue was "Thompson's first habeas petition." Id. Today, we rule on his second habeas petition. This is a different case. This time, we are not hearing en banc the motion for recall of our mandate regarding Thompson's first habeas petition. We heard that case, decided it, and were reversed by the Supreme Court. That case is over. A second or successive application is by definition a new case, albeit by the same plaintiff against the same defendant. That is why it cannot be filed without authorization.
 
 
 84
 Fortunately, we have agreed upon the proper result, despite our disagreements on some aspects of the proper procedure for doing so. It has been seventeen years since Thompson murdered Ginger Fleischli. During that time Thompson has had the most extensive and careful consideration of his case at every level of the state and federal systems, including two decisions, one to deny certiorari and another on the merits, before the Supreme Court. Great numbers of the most highly talented lawyers have devoted the utmost zeal to advocating every possible theory on his behalf. That he murdered Ms. Fleischli has not been put seriously in doubt. The issue has been whether the trial jury was right that Thompson raped Ms. Fleischli before he murdered her, or whether he had sexual intercourse with Ms. Fleischli with her consent before he put a knife through her head. Justice requires a conclusion. Proper procedure does not prevent a case from ever reaching a conclusion.
 
 
 85
 While I concur in the result reached by the court, I believe that our en banc panel would have had no jurisdiction to grant relief in any event.
 
 
 86
 REINHARDT, Circuit Judge, concurring and dissenting:
 
 
 87
 I concur in Parts I, II, III and IV of the majority opinion. However, because, in my opinion, Thomas Thompson has made a prima facie showing of facts which, if believed, would mean that no reasonable juror could find him guilty of rape, I dissent from Part V. I would grant Thompson permission to file a second habeas petition and remand to the district court for a full hearing on the new evidence that he has presented.
 
 
 88
 This court's refusal to allow Thompson to file a habeas petition will result in the execution of a man who was convicted and sentenced to death in a trial that violated fundamental principles of fairness, in which the constitutional violations were so egregious that seven former prosecutors, themselves highly experienced in death penalty cases, took the remarkable step of filing an amicus brief on his behalf with the United States Supreme Court.[1] Last August, this en banc court held Thompson's trial constitutionally defective by a seven to four vote--a conclusion that has not to date been refuted by any court.[2] While we are barred on procedural grounds from reversing Thompson's conviction and death sentence on the basis of these most serious constitutional violations, they nonetheless must color the prism through which we view the evidence of rape and the procedures to which he is now entitled. Today's decision bars Thompson from presenting, at a hearing which could establish his actual innocence, newly discovered evidence that was improperly withheld by the state. The end result is that a man who did not receive a fair trial and is likely innocent of the conduct for which he received a capital sentence will nevertheless be put to death by the state without ever having received any form of fair hearing and without ever having had an opportunity to present the most critical evidence of his innocence at a fair fact-finding proceeding.[3]
 
 
 89
 Thompson has made a prima facie showing of actual innocence of rape as required by AEDPA: "facts ... [which] if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii). A prima facie showing is established by "a sufficient showing of possible merit to warrant a further exploration by the district court." Woratzeck v. Stewart, 118 F.3d 648, 650 (9th Cir.1997) (per curiam) (quoting Bennett v. United States, 119 F.3d 468, 469 (7th Cir.1997)).
 
 
 90
 Thompson has submitted newly discovered evidence which, if believed, would cause any reasonable juror to have a reasonable doubt about his guilt of the rape charge and thus the rape enhancement: evidence that David Leitch, Fleischli's former lover who was also accused and convicted of Fleischli's murder, has admitted that on the night of the murder, he walked into the apartment he shared with Thompson and observed Thompson and Fleischli engaged in consensual sex. By this admission, Leitch placed himself at the murder scene before the murder occurred--a most damaging admission given the contrary story he has generally told.
 
 
 91
 Leitch's admissions directly contradict the prosecution's theory that a violent rape occurred--a rape that would have been obvious to any observer. Accordingly, no jury that believed that Leitch was telling the truth could credit the prosecution's theory, and thus, no jury that credited the Leitch admissions could convict Thompson of rape. Therefore, the question of whether Thompson can establish his actual innocence by clear and convincing evidence comes down to a pure credibility determination. Are the Leitch admissions true? As I will explain later, it is reasonably likely that they are. Thompson has therefore not only made the showing that § 2244(b) requires in order to obtain permission to obtain a hearing before an impartial district judge, but has clearly established the need for a full and fair evidentiary hearing at which the version of events contained in Leitch's admissions can be tested by examining and cross-examining witnesses with actual knowledge of the facts. Instead we opt to execute a man on the basis of a prosecutorial theory that is supported largely by circumstantial evidence.
 
 
 92
 As this en banc court's earlier unrefuted opinion determined, Thompson was convicted of rape by a jury which had never heard a defense to the charge, because Thompson's lawyer--whose performance fell far below minimal constitutional standards for effective assistance of counsel--decided to argue without any evidentiary basis that Leitch was "the rapist." He did so instead of challenging the prosecutor's fundamental premise that a rape occurred--a premise based almost entirely on circumstantial evidence that the sexual act between Thompson and Fleischli was non-consensual rather than consensual. Thus, the prosecution's theory that a rape was committed--the theory that underlies Thompson's capital sentence--was never adequately tested. Also, as our earlier en banc opinion concluded, Thompson was prosecuted by a district attorney who at two separate trials presented two contradictory theories of who was responsible for murdering Ginger Fleischli, and earlier at two separate proceedings in Thompson's case presented two contradictory theories as to whether a rape had occurred.[4] Thompson was convicted in part on the testimony of two jailhouse informants who claimed that he had confessed rape and murder to them. Their version of the crime directly contradicted the version testified to by four other jailhouse informants who had appeared for the prosecution at Thompson's preliminary hearing.[5] It is ironic in light of the glaring inconsistencies in the prosecutor's theories and the stories of the prosecutor's witnesses that the majority deprives Thompson of an evidentiary hearing because Leitch's statements exculpating Thompson were contradicted by other statements he made in order to try not to inculpate himself.
 
 
 93
 Despite the history of repeated constitutional violations that must seriously shake any rational observer's faith in the outcome of this case, and in the face of newly discovered evidence that undermines the factual basis for the rape conviction and enhancement, if not of the murder itself, the majority concludes that it must allow Thompson's execution to go forward without permitting him the opportunity to have a hearing on this critical new evidence. I respectfully dissent. I do not believe that the law, even after Calderon v. Thompson, --- U.S. ----, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998), requires such a gross miscarriage of justice.
 
 
 94
 The rape conviction, and thus the rape enhancement, is the key to the state's right to execute Thompson. Without it, as the majority acknowledges, Thompson is not death eligible; in short, without it, California may not lawfully put him to death. Leitch's account of consensual sex is the only eyewitness testimony--the only direct evidence other than that provided by Thompson himself of what actually happened the night that Fleischli was murdered--the only direct evidence as to whether a rape actually occurred. This newly discovered evidence potentially calls into question all of the conclusions that have been heretofore drawn from the array of circumstantial and jailhouse informant evidence presented against Thompson.
 
 
 95
 Up until now, the evidence of rape, untested at Thompson's trial because of his lawyer's inexplicable decision not to contest the rape allegation, has been--aside from the inconsistent and unreliable jailhouse informant testimony--entirely circumstantial.[6] The bruising of Fleischli's wrists, ankles and palms, evidence that she was gagged with duct tape, and the fact that someone ripped her shirt and bra down the middle and pulled it down around her elbows all suggest that she was violently restrained at some point on the evening she was murdered. The presence of semen in her body establishes that she had intercourse shortly before her death, with someone of Thompson's (and, incidentally, Leitch's) blood type.
 
 
 96
 Of course, this circumstantial case was established at a trial at which the jury never had the opportunity to hear the evidence tested by an adversarial process. It is no wonder that the prosecution could assemble a fair amount of evidence that appeared to support the charge of rape at a trial at which defense counsel decided to attempt to blame the "rape" on someone else rather than to seek to establish, as he might well have done, that there had been no rape at all. And while the Supreme Court found that the conflicting forensic testimony Thompson presented at the evidentiary hearing on his first habeas petition was not in itself sufficient to meet the Schlup or Sawyer standards,[7] the evidence of Thompson's guilt was certainly not so clear that testimony as to what a direct eyewitness observed need not be considered or tested before a trier of fact.[8]
 
 
 97
 The majority bases its decision in part on its assertion that the evidence that Thompson raped Fleischli is "overwhelming." That is simply not the case. All one need do is read Judge Fletcher's en banc opinion of last August to discover that today's characterization of the evidence is plainly incorrect. While the majority of the Supreme Court may have viewed the evidence as sufficiently strong to withstand, for purposes of a second or successive petition, an attack based on conflicting forensic evidence, we are by no means compelled by Calderon to misstate the quantum of evidence so egregiously. Nor, in my opinion, are we compelled to overlook the fact that the not-so-overwhelming evidence was adduced at a trial at which a constitutionally inadequate defense to the charge of rape was offered.
 
 
 98
 Until now, there has been no witness--other than the not-so-credible defendant--who could shed direct light on what actually occurred the night Ginger Fleischli was murdered. There was no witness who acknowledged observing the sexual act that took place between Thompson and Fleischli. All that was available previously was circumstantial evidence and the substantially "discredited" testimony of the prosecution's second set of jailhouse informants. Thompson now offers evidence that as early as 1982 Leitch had been reporting a version of events which, contrary to Leitch's own interests, establishes his presence in the apartment before the murder took place and directly corroborates the crucial portion of Thompson's trial testimony, namely, that the sexual act between Fleischli and Thompson was consensual.
 
 
 99
 Thompson presents a declaration authorized by Judge Ronald P. Kreber, who served as Leitch's defense attorney at his 1985 trial and has since been appointed Presiding Judge of the South Orange County District by Governor Pete Wilson. Kreber states that before Leitch's trial Leitch informed him that the night that Fleischli was murdered Leitch walked into the apartment he shared with Thompson and witnessed Thompson and Fleischli engaged in consensual intercourse. Thompson also presents convincing evidence that Leitch told this same version of events to law enforcement officials. A declaration by a defense investigator states that retired Orange County Sheriff's detective Floyd Owens acknowledged that he may have heard this from Leitch. Although the majority points out that in a later declaration obtained by the state Owens retracts the statement that Leitch was the direct source of this information, Owens continued to affirm that as early as 1982 he had been informed of Leitch's version of events, and identified the Orange County District Attorney's office as the most likely source of the information. There is no satisfactory explanation, however, of who the actual source of this information could be other than Leitch himself.[9] Next, at Leitch's 1995 parole hearing, he told substantially the same story: that he walked in and saw Fleischli and Thompson having sex, and that he perceived no indication of rape.[10] Finally, Leitch told a defense investigator that he believed he had told investigators about these events at the time of Thompson's trial.
 
 
 100
 Leitch's admissions against interest regarding what he observed starkly contradict and are wholly inconsistent with the events as theorized and argued by the prosecution--that Thompson raped Fleischli while she was handcuffed, her ankles bound, her mouth gagged, her clothes ripped, and a knife to her head. Certainly such a lurid scene could not have escaped the notice of a man standing approximately ten feet away. The newly discovered Leitch version, if true, would preclude any reasonable juror from finding Thompson guilty beyond a reasonable doubt.
 
 
 101
 Owens' information was never disclosed to the defense. Thompson's attorneys became aware of Owens' knowledge only upon conducting their own investigation, initiated after they learned of the similar story told by Leitch at his 1995 parole hearing. They discovered the latter information when preparing for the 1997 clemency proceeding. The state had failed to disclose the 1995 information as well.[11] The state's failure to disclose crucial evidence corroborating Thompson's testimony--while at the same time continuing to argue that the incredible and unbelievable nature of his testimony convincingly demonstrated his guilt--casts serious doubt upon the conclusions drawn by the many courts that considered Thompson's first habeas petition. Moreover, applying the prima facie Woratzeck standard, the evidence regarding the failure to disclose certainly satisfies the Brady constitutional error requirement of § 2244(b).[12]
 
 
 102
 The district court is right that whether it was Leitch himself who told Owens in 1982 that Leitch had witnessed consensual sex between Thompson and Fleischli or whether it was a member of the prosecutor's office or even whether it was someone else is subject to dispute. The court is also right in pointing out that Leitch's own credibility is suspect, given the conflicting versions of events that he has told over the years. However, the district court was wrong in discarding the likelihood that the admissions contrary to Leitch's own interests were true, and in making findings of fact and credibility determinations adverse to Thompson unaided by the traditional methods of judicial fact-finding: testimony and cross-examination.[13] Thompson has offered evidence of statements which, if found truthful, would require any reasonable jury to find him not guilty, and he should have been given the opportunity to fully test and explore the veracity of Leitch's statements in a properly conducted judicial proceeding. In any event, Thompson has, most certainly, made "a sufficient showing of possible merit to warrant a further exploration by the district court." Woratzeck, 118 F.3d at 650 (citation omitted).
 
 
 103
 Of course, Thompson would make a stronger showing if he could have produced a sworn affidavit from Leitch. But, contrary to the majority's view, his inability to do so does not necessitate his execution without affording him a hearing at which he can develop the facts. Leitch is currently in prison seeking parole from his own conviction for his role in the murder of Ginger Fleischli, and minimizing his own involvement in the offense is certainly in his interests. It is therefore not surprising that Leitch has on most occasions testified that he was not present at the apartment while Fleischli was still alive, since any statement to the contrary would be clearly inculpatory.[14][14] Not only do Leitch's recently discovered admissions link him to the murder through his presence on the scene, but characterizing the sex as consensual rather than as a rape undermines the prosecution's and Leitch's only explanation for why Thompson--as opposed to Leitch, her former lover--would kill Fleischli. Under these circumstances, I think it clear that Thompson meets the Woratzeck standard, even in the absence of a sworn declaration by Leitch.
 
 
 104
 The other versions of events which Leitch had told over the years had one thing in common: he disclaimed any role in the murder of Fleischli and pointed instead to Thompson as the killer. The story of consensual sex, on the other hand, is consistent with what Leitch told his own lawyer in confidence at the time of his trial, when he had the opportunity to tell the truth without fear of adverse consequences and had no reason to lie. This story is not recently fabricated, nor does it serve Leitch's interests. Such factors bolster the credibility of Leitch's story despite the absence of a sworn declaration from him. Since Leitch would of course be extremely reluctant to make statements that further implicate him in Fleischli's murder, we must, at least for purposes of deciding whether further exploration of the facts is warranted, afford special weight to those occasions on which he did acknowledge his presence in the apartment immediately preceding the murder.
 
 
 105
 It would be premature to conclude that Leitch's testimony must be believed. But Thompson has clearly put forward a prima facie showing of actual innocence. It is not essential that Thompson produce a sworn statement by a reluctant, if not adverse, witness; because eliciting that type of testimony and subjecting a hostile witness to examination and cross-examination is precisely the function of an evidentiary hearing.
 
 
 106
 At this hearing, which will now unfortunately never occur, the district court could have received testimony from Owens, Leitch, Kreber and others that might well have revealed what actually happened the night of Fleischli's murder. The court could have resolved the pure credibility questions that Thompson's actual innocence hinges upon by testing the available evidence in the crucible of an adversary proceeding. Only then, would we have been able to determine whether Thompson could have shown "clear and convincing evidence that ... no reasonable factfinder would have found [him] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).
 
 
 107
 Instead, the district court determined solely on the basis of declarations and transcripts--necessarily limited documents which are missing crucial details and which do not allow for testing the declarant's credibility--that Leitch never made the earlier statement, that he didn't necessarily mean that the sex he witnessed was consensual, and that even if he did mean this then his testimony was not credible. The district court erred in reaching premature conclusions, an error that precluded any inquiry whatsoever into critical evidence of actual innocence. The majority now makes a closely related error, although its denial of the petition for leave to file a successive petition is based on an erroneous legal standard. The majority asks far too much of a capital defendant in the way of demonstrable proof at this stage of a § 2244 proceeding. Given the circumstances of Thompson's trial and the fact that the issue before us turns on the credibility of the admissions of a witness with directly conflicting interests, the requisite prima facie showing under § 2244 has indeed been made.
 
 
 108
 What is truly regrettable is that Thompson--convicted largely on the basis of circumstantial evidence, in a trial in which he did not receive effective assistance of counsel--has now produced evidence regarding the observations of the only eyewitness to the sexual act, the character of which is dispositive of whether, under the law, he may be executed. Yet today, the majority deprives him of the one fair opportunity he would have had to prove what actually happened--to establish his actual innocence of the capital offense. If a man's life were not at stake, it would be almost ironic that, in the context of the tortured procedural history of this case, the majority feels compelled to weigh the strength of the conflicting circumstantial evidence and to cavil about the ultimate quality of the admissions of the only living eyewitness rather than to permit a court for the first time to conduct a full and fair evidentiary hearing. There are indeed more important considerations involved in cases such as this than are properly reflected in our abstruse debate over the quality and persuasiveness of the declarations Thompson has submitted.
 
 
 109
 This case can be described simply. Egregious constitutional violations and this court's own procedural errors have combined to prevent Thompson from obtaining full and fair consideration of his defense to the charges that will shortly result in his execution. A record scarred by violations of due process and littered with procedural barriers to consideration of the merits of the case should not form the basis for allowing a person's execution. In my opinion, it was well within the majority's power to afford Thompson a hearing and avert this grave injustice.
 
 
 110
 Despite increasing restrictions on the writ of habeas corpus, the door has nonetheless been left open for someone who can make a convincing demonstration of actual innocence under 28 U.S.C. § 2244(b)(2)(B). As the statute makes plain, "actual innocence" means that no reasonable fact-finder would find the defendant guilty beyond a reasonable doubt. In a capital punishment case, actual innocence means that the defendant would not be found guilty of an act that constitutes a capital enhancement or permits imposition of a capital sentence.
 
 
 111
 In this case, if the credibility determinations regarding Leitch's observations are resolved in Thompson's favor--certainly a plausible outcome of an evidentiary hearing--then no rational juror could convict Thompson of rape. No jury has ever heard this evidence--Leitch concealed it for his own reasons, and the state did not disclose it--and thus no finder of fact has ever had the opportunity to decide whether what Leitch told Judge Kreber is true: that Leitch observed Thompson and Fleischli having consensual sex.
 
 
 112
 It is unconscionable that we do not afford Thompson the opportunity to test such crucial evidence before a district court judge. As some of my colleagues in the majority surely recognize, the fact that it now appears inevitable that Thompson's execution will go forward is truly a travesty of justice. Although I respect the majority's belief that it is bound by precedent and statute to reach the decision it does, I simply do not agree that the law requires that result. For these reasons, I cannot join in the majority's refusal to allow Thompson to file a petition for writ of habeas corpus.
 
 
 113
 In closing, I would observe that the miscarriage of justice that is about to occur is the product of the federal judiciary's elevation of procedure over justice, of speed and efficiency over fairness and due process. I regret that we have chosen that course in recent years, and believe that in doing so, we have severely tarnished our nation's justice system. It is the courts that should engender in all of the people an enduring commitment to liberty and fairness. That commitment will surely not be inspired by this case and others like it. I respect the majority's decision. However, I believe that my colleagues have made a most serious error. We not only have the power to allow Thompson to have a full and fair hearing before he is executed, but an obligation to do so. I would grant his request for leave to file a second or successive petition.
 
 
 114
 TASHIMA, Circuit Judge, concurring in part, and dissenting in part:
 
 
 115
 I concur in Parts I, II, III and IV of the majority opinion; however, I dissent from Part V. I also agree with Judge Reinhardt's trenchant analysis as to why we should grant Thompson's motion to file a second habeas petition.
 
 
 116
 28 U.S.C. § 2244(b)(2) provides that a successive habeas claim "shall be dismissed unless" the conditions of subsection (B)(i) and (ii) are met. Thus, this is a standard that should be applied at the end of the fact-finding process, not its beginning, as the majority does. By contrast, § 2244(b)(3)(C) requires only "a prima facie showing that the application satisfies the requirements of this subsection" in order to authorize the filing of a second or successive application.
 
 
 117
 "Prima facie showing" may have several shades of meaning, but, where eventual submission to a fact finder is contemplated, it means nothing more than that the evidence, if believed, would entitle the applicant to relief. Otherwise, § 2244(b)(2)(B)(ii) would not contain the phrase "if proven." As Judge Reinhardt's summary of the newly-discovered evidence convincingly demonstrates, Thompson has made a "prima facie showing" that his claim, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [Thompson] guilty of the underlying offense" of capital homicide. The majority's error is in assessing credibility and weighing the evidence as if it were the fact finder at the evidentiary hearing, rather than confining itself to determining whether, if believed, the evidence presented amounts to a prima facie showing.
 
 
 118
 Because I believe that Thompson's motion for an order authorizing the district court to consider a second or successive application should be granted, I dissent from Part V of the majority opinion and from the judgment.
 
 
 
 [1]
 Cir. R. 22-3(a)(3) provides, in pertinent part:
 When a case is pending before a death penalty en banc court, any additional appeal or a matter pertaining to that case will be assigned to the panel with responsibility for that case, unless the question presented is such that its decision would resolve an issue then before the en banc court, in which event, in its discretion, may review the panel decision. The determination as to whether the case is assigned to the panel or to the en banc court is made by the Chief Judge in consultation with the concerned panels.
 
 
 [2]
 Fed. R Civ. P. 60(b) provides that:
 [O]n motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ... or (6) any other reason justifying relief from the operation of the judgment.
 
 
 [3]
 For example, if the State's misconduct prevented the defendant from testing potentially exculpatory evidence which might provide the information necessary to assert a factual predicate for a successive petition, an independent Rule 60(b)(3) motion might be appropriate. In such a case, an application under section 2244 would afford no relief because the petitioner would not have the necessary exculpatory evidence in his possession, and the State might well have an incentive to avoid its disclosure obligations in habeas proceedings under Thomas v. Goldsmith, 979 F.2d 746, 749-50 (9th Cir.1992). Thus, under those circumstances, it would be unfair and incongruent to treat a Rule 60(b)(3) motion as functionally equivalent to a successive petition. That is but one example, but it suffices to say that a bright line rule equating all Rule 60(b) motions with successive habeas petitions would be improper
 
 
 [4]
 We disagree with the Seventh and Eleventh Circuit decisions rejecting a petitioner's claim of innocence of the death penalty as not cognizable under § 2244(b)(2)(B). See Burris v. Parke, 116 F.3d 256, 258 (7th Cir.1997); In re Medina, 109 F.3d 1556, 1565-66 (11th Cir.1997)
 
 
 [1]
 These seven included the draftsman of the death penalty statute under which Thompson was prosecuted and the individuals who served in positions in which they made final decisions about whether to seek the death penalty in all Los Angeles County cases (for a period of twelve years) and all Sacramento County cases (for over six years). These experienced prosecutors urged Supreme Court action because "this is a case where it appears that our adversarial system has not produced a fair and reliable result...." Brief of Amici Curiae in Support of Petitioner at 4-5, Thompson v. Calderon (No. 96-8707) (filed May 6, 1997)
 
 
 [2]
 The Supreme Court decision reversing our judgment did not reach the merits of Thompson's constitutional claims. See Calderon v. Thompson, --- U.S. ----, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998). Instead, in a five to four decision, the Court adopted new rules limiting even further the right of habeas corpus and restricting in an unprecedented manner the authority of federal courts to recall their mandates to correct constitutional errors. But cf. Agostini v. Felton, 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) (granting relief under Rule 60(b)(5) from twelve-year-old injunction barring school district from sending public school teachers to parochial schools for remedial educational services); 521 U.S. at ----, 117 S.Ct. at 2026 (Ginsburg, J., dissenting). On the basis of a rule newly adopted in Thompson, the Court held that we should not have reached the merits of Thompson's claims
 
 
 [3]
 The district judge who originally correctly determined that Thompson's trial had been constitutionally flawed after painstakingly studying the entire record of the trial for several years, died prior to the time Thompson filed his motion based on newly discovered evidence. A new district judge first determined that he had no jurisdiction over the motion and then, as a protective measure, summarily ruled against Thompson on the merits of his claim on the basis of credibility determinations made without the benefit of witnesses or live testimony
 
 
 [4]
 At Thompson's trial, the prosecution put on evidence that Thompson had raped and murdered Fleischli, that Leitch was not present, and that Leitch's only involvement was to help dispose of the body. At Leitch's trial, the same prosecutor argued that Leitch was present and that he was an active participant in Fleischli's murder--and suggested that the version of events it had established at the first trial was inherently implausible
 
 
 [5]
 At the time of the preliminary hearing, Leitch and Thompson were to be jointly tried. The prosecution put on jailhouse informants who testified that Thompson had confessed to them that Leitch had recruited him to commit the killing. One informant testified that Thompson had told him that he had engaged in intercourse with Fleischli, but had not raped her. By the time of the trial, the two cases had been severed, and the prosecution abandoned its original theory along with the first group of jailhouse informants, whose testimony no longer served its purpose; instead, the prosecution now pursued a different theory, that Thompson had raped and murdered Fleischli on his own, and supported this theory with a new set of demonstrably unreliable jailhouse informants who told a new tale of what Thompson had supposedly admitted that was consistent with the prosecution's new and contradictory theory
 
 
 [6]
 That evidence includes the fact that Thompson took the stand and, we must presume, lied about the murder. As the Supreme Court pointed out, that fact makes it difficult for Thompson to persuade the jury that he was innocent of the rape charge. It also makes it even more important that the only percipient witness's story be considered before we execute a man for an offense he probably did not commit
 
 
 [7]
 See Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); Sawyer v. Whitley, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992)
 
 
 [8]
 This is particularly so when the injuries and other physical evidence that the Supreme Court found to be "ample evidence" of rape could also have been sustained by Fleischli during the murder itself
 
 
 [9]
 The government claims that Owens' later declaration clarifies that the source of this version of events was not Leitch himself but jailhouse informant David Vogel. Such an explanation is highly unpersuasive. Vogel's statements are not consistent with the version of events described by Owens--and Vogel therefore could not be the source of Owens' information. Vogel testified that Thompson, not Leitch, told him that Leitch walked into the apartment after Thompson and Fleischli had finished having sex, not while they were so engaged. Since the account that Leitch walked in and discovered his roommate and Fleischli in the midst of intercourse could in all likelihood only have come from Leitch himself, there remain critical unanswered questions about the source of Owens' information. Moreover, Owens' retraction of many of the statements he made to defense investigators should not be accepted as credible without adversarial testing
 
 
 [10]
 Again, that Leitch suggested later in the same hearing that the reason Thompson had killed Fleischli must have been "rape" raises a question as to whether the earlier statement that is contrary to Leitch's own interests or the later statement that tends to be self-exculpatory is the truthful one. How these conflicting statements would be resolved after a full adversary evidentiary hearing is not before us. We are now at a prima facie stage of the proceedings. For that purpose, Leitch's admissions present a most serious question and constitute a sufficient showing
 
 
 [11]
 28 U.S.C. § 2244(b)(2)(B)(i) requires that Thompson demonstrate he could not have discovered the factual predicate for his claim through the exercise of due diligence. Because the government did not disclose Leitch's statement to the defense, they had no reason to interview Owens about what he might have heard. Leitch, who was facing his own trial on murder charges, was unlikely to have voluntarily spoken with Thompson's defense; in fact, as late as 1992 he refused to cooperate with their efforts to obtain critical information from him. Due diligence therefore would not have uncovered this information in time for Thompson's first habeas proceeding. In any event, one year ago the California Supreme Court found that Thompson had presented this evidence in a timely manner. In re Thomas Martin Thompson on Habeas Corpus, No. S062592 (Cal. filed July 16, 1997)
 
 
 [12]
 It seems fairly apparent that this failure to disclose evidence that was material to Thompson's guilt or punishment violates the prosecution's duty under Brady v. Maryland, 373 U.S. 83, 87, 108, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Brady duty is an ongoing one, and continued to bind the prosecution throughout Thompson's habeas proceedings. See Pennsylvania v. Ritchie, 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Thomas v. Goldsmith, 979 F.2d 746, 749-50 (9th Cir.1992). A prosecutorial violation of Brady would fulfill 28 U.S.C. § 2244(b)(2)(B)'s requirement of constitutional error
 
 
 [13]
 The district court found that it had no jurisdiction but, in dicta, assumed that it could treat the motion as a successive habeas petition not subject to the requirements of the AEDPA. It was in that context that it made the findings of fact referred to here. I treat these findings for purposes of this dissent as if they were valid. I do not question the district court's decision to answer as many potential questions as possible when it did, in light of the incredible time constraints under which we are compelled to operate in death penalty cases
 
 
 [14]
 Michael Jacobs, the district attorney who prosecuted both Leitch and Thompson, has explained that Leitch's statement which exculpates Thompson could be very damaging to Leitch himself:
 Jacobs: It would have been a great statement for me to have if I could have used it against Leitch at this trial. I would really like to have that statement. So--
 Question: To have him saying that he saw consensual sex and not a rape?
 Jacobs: Oh yeah, as far as Leitch's trial, then I could have put him back there before the killing took place and he would have been in deep trouble then. Like if I could have got him on the stand to say that in 1983 it would have been the best thing that could have happened to my case, against Leitch. I would have give anything to have that statement or have him testify to that. So that would have--So, see that would have been a plus for the prosecution of Leitch.
 Transcript of Radio Interview, Which Way, L.A.?, July 22, 1997.