# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

—————

No. 03-3995

—————

Melvin Leroy Tyler,                          *
                                             *
            Appellant,                       *
                                             *
      v.                                     *    Appeal from the United States
                                             *    District Court for the
James Purkett, Superintendent at FCC;        *    Western District of Missouri.
Al Luebbers; Jeremiah (Jay) W. Nixon;        *
Dave Dormire,                                *
                                             *
            Appellees.                       *

—————

Submitted:  April 12, 2005
    Filed:   July 5, 2005

—————

Before LOKEN, Chief Judge, WOLLMAN and BEAM, Circuit Judges.

—————

WOLLMAN, Circuit Judge.

Melvin Leroy Tyler appeals from the district court's[1] decision finding that no testable physical evidence in his case currently exists and that the evidence was lost under negligent or otherwise inadvertent circumstances. We affirm.

———————————

[1]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

## I.

## A.

In 1977, Tyler was convicted of one count each of robbery in the first degree, rape, kidnaping, and armed criminal action for a December 27, 1976, attack on a housewife in Columbia, Missouri. After denying a motion for new trial, the state court judge presiding at Tyler's trial sentenced him to a total of 185 years' imprisonment. Tyler promptly appealed, and his conviction was upheld by the Missouri Court of Appeals. State v. Tyler, 587 S.W.2d 918 (Mo. Ct. App. 1979). Tyler then filed his first petition for federal habeas corpus relief, which we dismissed for failure to exhaust certain claims. Tyler v. Wyrick, 730 F.2d 1209 (8th Cir. 1984).

In 1989, Tyler filed his first motion for state postconviction relief. Following a lengthy evidentiary hearing, the state court denied Tyler's motion, and its decision was affirmed on appeal. Tyler v. State, 794 S.W.2d 252 (Mo. Ct. App. 1990). Tyler subsequently filed two more motions for state postconviction relief, but both were denied as untimely or successive. Tyler v. State, 941 S.W.2d 856 (Mo. Ct. App. 1997) (untimely); Tyler v. State, 994 S.W.2d 50 (Mo. Ct. App. 1999) (untimely and successive).

After failing to secure postconviction relief in Missouri state court, Tyler filed a second petition for federal habeas corpus relief in 1990. The district court denied Tyler's petition, and we denied his subsequent motion for a certificate of probable cause. Tyler v. Purkett, No. 93-2757 (8th Cir. Sept. 7, 1993), cert. denied, 511 U.S. 1008 (1993).[2] Tyler next filed a third petition in federal court, which was again

---

[2]Tyler later made a Fed. R. Civ. P. 60(b) motion to vacate the district court's denial of his second petition. The district court denied the motion. We declined to grant a certificate of probable cause and dismissed Tyler's appeal. Tyler v. Purkett, No. 96-1016 (8th Cir. Jan. 18, 1996), cert. denied, 522 U.S. 1031 (1997).

denied by the district court.[3]  We denied Tyler's motion for a certificate of appealability.  Tyler v. Purkett, No. 97-1327 (8th Cir. Mar. 17, 1997).

In 1998, Tyler sought to reopen both his 1990 (second) and 1994 (third) petitions by making another Fed. R. Civ. P. 60(b) motion to the district court.  In substance, the Rule 60(b) motion contended that various physical evidence—including the victim's undergarments and semen and hair samples taken therefrom—was currently possessed by the State; that the State had misled and defrauded both the Missouri state courts and the federal courts in representing that it no longer had such evidence or that such evidence never existed; that such evidence should be tested immediately in order to prove Tyler's innocence; and that newly discovered evidence existed mandating the reopening of his case.  The district court treated the motion as a second or successive habeas petition, and thus held that it could not consider the motion absent authorization from this court.  See, e.g., 28 U.S.C. § 2244(b)(3).  The motion was therefore denied, as was Tyler's subsequent motion for reconsideration.

On appeal, a panel of this court initially denied Tyler's motion for a certificate of appealability.  After Tyler petitioned for rehearing, however, the en banc court granted a certificate of appealability "on the question whether there exists evidence, such as semen, hair, items of clothing, and related materials, that could be subjected to DNA testing."  Tyler v. Purkett, No. 00-1432 (8th Cir. June 20, 2000).  The en banc court's order further instructed the district court to conduct an evidentiary hearing on Tyler's argument that testable evidence existed, to order the evidence tested if the district court found that such evidence did exist, and to enter findings regarding the circumstances of the evidence's destruction or loss if the district court found that the evidence existed at one time but could no longer be found.  Id.

_____

[3]Both Tyler's second and third federal habeas petitions were adjudicated by the Honorable Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.  After Judge Stevens's death, Tyler's cases were transferred to Judge Gaitan.

Following the evidentiary hearing, the district court ultimately found that the evidence cited by Tyler (semen, hair, items of clothing, and related materials) no longer existed and could not be found, and thus could not be subjected to DNA testing. D. Ct. Order of September 5, 2003, at 6. The district court further found that, although such evidence had existed at one time, the evidence was accidentally, negligently, or otherwise unintentionally lost or destroyed at some time after Tyler's 1977 trial but before his first state postconviction motion in 1989.[4] Id. at 7.

**B.**

Tyler's claims on appeal center on the fate of three items collected from the victim of his crimes: her panties, pantaloons, and a piece of tissue paper taken from the panties. It is undisputed that the items were collected from the victim shortly after the commission of the crimes. Other items collected in connection with the Columbia Police Department's investigation included a pubic hair from the couch on which the rape took place, a blood-covered shirt, and pubic hairs from both the victim and Tyler. Additionally, Dr. William See, the victim's gynecologist, collected a specimen of fluid from the victim's vagina, observed a number of active sperm when observing the specimen under a microscope, and discarded the specimen.[5]

---

[4]In addition, prior to his hearing in the district court, Tyler filed a motion for DNA testing in Missouri state court. See Mo. Rev. Stat. § 547.035. After an evidentiary hearing, the state court similarly found that the victim's undergarments, as well as any hair and semen samples, were lost between 1977 and 1989. Furthermore, the state court found that the circumstances of the evidence's loss did not constitute bad faith resulting in a denial of due process. See Arizona v. Youngblood, 488 U.S. 51, 57 (1988). The state court accordingly denied Tyler's motion, and the Missouri Court of Appeals affirmed. State v. Tyler, 142 S.W.3d 785 (Mo. Ct. App. 2004).

[5]Tyler apparently does not dispute that the semen discarded by Dr. See no longer exists or that the hair samples taken from himself, the victim's couch, and the victim were destroyed in a neutron activation test, the results of which were inconclusive. See Tyler D. Ct. Exhibit A at items 6-8.

-4-

Prior to trial, Tyler and his appointed counsel each made a motion for appointment of experts. Tyler's counsel requested an order appointing an expert "to analyze certain fingerprints and hair and blood samples taken and collected at the scene" of the crime. Trial Tr. at 50-51. Tyler himself (acting *pro se*) requested that experts be appointed "because of the fact that the State of Missouri [would] introduce certain evidence of fingerprints, sperm, and possibly hair," "because the failure of the state to provide a neutron activation test on the sperm and hair" necessitated the appointment of an expert to conduct such tests, and because "any traces of sperm, hair, blood, etc., [could not] be used wherein defendant cannot show the same does not belong to him." Id. at 142-44. In denying both motions, the trial court found that no evidence involving fingerprints, hair, blood, or seminal fluid existed, had been collected, would be offered at trial, or was in the possession of anyone.[6] Id. at 412. The state prosecutor noted that Dr. See had found some seminal fluid during his examination of the victim, but that it had not been collected. Id. Tyler later asserted in his motion for new trial that the state had "failed to disclose the blood typing of the sperm found on panties, tissue, and pantaloons" taken from the victim, id. at 1156, but the trial court either refused to consider the issue—raised in a *pro se* amended pleading—or rejected the argument without comment.

On direct appeal, Tyler apparently did not argue that experts should have been appointed for him or that the State had failed to disclose certain evidence or test results. Instead, he argued that Dr. See's testimony should not have been admitted because Dr. See had not attempted to determine the blood type of the sperm's source. In his first motion for state postconviction relief, Tyler renewed this claim. In addition, Tyler asserted that the State had failed to conduct the proper tests on the semen found by Dr. See and had failed to disclose that testing had been done on the victim's clothing and the results of such tests. He further alleged that he was denied due process through the erroneous denial of his motion to appoint experts. Shortly

_____

[6]The evidence in question was not offered at trial.

after Tyler filed interrogatories in connection with his postconviction motion, the State asserted that the evidence Tyler referenced—the victim's panties and pantaloons, as well as the tissue—could no longer be found and thus could no longer be tested. Tyler subsequently argued that, as a result of the loss, he was entitled to an immediate vacation of his sentence and a discharge from incarceration.

Tyler's postconviction arguments focused on a report compiled by Susan Land, who in 1977 was a forensic chemist at the Missouri State Highway Patrol Laboratory. The report, which Tyler utilized in his postconviction pleadings, showed that Land had examined the items of clothing in question. The report stated that tests conducted on the clothing had detected the presence of acid phosphatase—a component of seminal fluid—on the panties, pantaloons, and tissue and had indicated the presence of sperm on the panties. The report further showed that certain hairs had been separated from the panties. Tyler claimed that the report clearly proved that the evidence was, at the very least, available to be tested at the time of his trial.

Although the state court agreed that the evidence had once been available, it disagreed that the fact that the evidence was no longer available mandated Tyler's release. Specifically, the state court held that the circumstances surrounding the loss of the evidence demonstrated a lack of intent to destroy or dispose of the evidence and that Tyler had thus failed to show the requisite bad faith to make out a denial of due process under Arizona v. Youngblood, 488 U.S. 51, 57 (1988). See Tyler Exhibit F-4 at 766-67.

In his subsequent second and third federal habeas petitions, Tyler again asserted error in the denial of his motion for appointment of experts. In his federal petitions, however, Tyler specifically attributed the error to the State's failure to disclose that Land had collected semen, hair, and phosphates from the victim's undergarments and that such evidence was available to test. After both petitions were denied, Tyler brought the instant Rule 60(b) motion.

## II.

As an initial matter, we must determine the framework under which we will consider Tyler's claims on appeal. The Rule 60(b) motion on which we granted a certificate of appealability arose from habeas petitions filed in 1990 and 1994. Because the Rule 60(b) motion "sought ultimately to resurrect the denial" of Tyler's earlier habeas petitions by asserting new claims of error in his state conviction and reasserting prior claims, however, it was properly construed as second or successive.[7]

---

[7]In the district court, Tyler attempted to avoid the treatment of his Rule 60(b) motion as a second or successive habeas petition in two ways. Neither is availing in this case. First, Tyler claimed that the Ninth Circuit's decision in Thompson v. Calderon, 151 F.3d 918 (9th Cir. 1998), differentiates his motion from a second or successive habeas petition. In Thompson, the Ninth Circuit stated in dicta that, "if the State's misconduct prevented the defendant from testing potentially exculpatory evidence which might provide the information necessary to assert a factual predicate for a successive petition, an independent Rule 60(b)(3) motion might be appropriate." Id. at 921 n.3 (emphasis added). We decline to utilize this dictum as a basis for modifying our settled practice of construing Rule 60(b) motions to reopen habeas cases as second or successive petitions when such motions "effectively or ultimately" seek habeas relief. See United States v. Lambros, 404 F.3d 1034, 1036 (8th Cir. 2005) (per curiam). Accord Gonzalez v. Crosby, No. 04-6432, slip op. at 13 (U.S. June 23, 2005). Furthermore, it is notable that the Ninth Circuit opined that its distinction was justified by the fact that, in such a case, an application for authorization to file a successive habeas corpus petition would provide no relief because a state might have an incentive to conceal evidence. Thompson, 151 F.3d at 921 n.3. In this case, however, the State of Missouri has no such incentive because it is undisputed that the evidence complained of was lost prior to Tyler's second habeas petition.

Second, Tyler suggests that the State's failure to disclose the existence of the evidence tested by Land constituted fraud on both the state and federal courts sufficient to bypass the procedural bar established by 28 U.S.C. § 2244. See generally Fierro v. Johnson, 197 F.3d 147, 153-54 (5th Cir. 1999). Claims that a party did not disclose to a court certain facts allegedly pertinent to the matter before it, however, do not normally constitute fraud on the court. Id. at 154. Furthermore,

Gonzalez v. Crosby, No. 04-6432, slip op. at 6, 7 n.4, 13 (U.S. June 23, 2005); United States v. Lambros, 404 F.3d 1034, 1036 (8th Cir. 2005) (per curiam). Furthermore, because the Rule 60(b) motion was filed after April 26, 1996—the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)—and because Tyler's prior petitions for habeas corpus relief were no longer pending on their merits at the time that the motion was filed, the motion is subject to AEDPA's strictures. See, e.g., Woodford v. Garceau, 538 U.S. 202, 204, 206-07 (2003).

When addressing habeas corpus petitions subject to AEDPA, we review the district court's findings of fact for clear error and its conclusions of law *de novo*. Evans v. Luebbers, 371 F.3d 438, 441 (8th Cir. 2004). In addition, we accord a presumption of correctness to state court determinations of factual issues. 28 U.S.C. § 2254(e). Furthermore, we may grant habeas relief with respect to a claim that was adjudicated on the merits in a state court proceeding only if the state court decision (1) was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d); Ryan v. Clarke, 387 F.3d 785, 790-91 (8th Cir. 2004), cert. denied, 73 U.S.L.W. 3694 (May 31, 2005).

## A.

Tyler first argues that because the State cannot show exactly how or when the disputed evidence was lost, and because the State allegedly failed to disclose the existence of the evidence, the district court's factual findings that the loss was accidental, negligent, or otherwise unintentional were clearly erroneous. We disagree.

---

for reasons stated below, we do not believe that the actions complained of in this case are sufficiently egregious to establish the "corrupt conduct" required to avoid § 2244. Id. at 155.

Pursuant to our 2000 order, the district court received live testimony and deposition transcripts from a variety of individuals involved in the retention and movement of evidence in this case, as well as various exhibits. Evidence routing slips show that a bag containing the victim's undergarments was originally taken to the Missouri State Highway Patrol Laboratory on January 21, 1977. Tyler's D. Ct. Exhibit A at item 5. After examination by Land, the items were returned to the Columbia Police Department on March 3, 1977, id. at item 21, and were forwarded to the Boone County prosecutor's office on March 16, 1977.[8] Id. at item 1. Milt Harper, the prosecutor in Tyler's case, testified that trial evidence in a specific case would normally stay in the prosecutor's office until the appellate process was complete, that he instructed his employees to be "very careful" in handling the evidence in Tyler's case, that his policy of directing employees not to destroy evidence in Tyler's case applied regardless of whether the evidence was actually utilized at trial, and that the evidence in Tyler's case was still in the prosecutor's office when he stepped down in 1978. Tyler D. Ct. Exhibit E at 28, 30, 47-52, 66. Joe Moseley, who succeeded Harper and held the office until 1992, similarly testified that the prosecutor's office could not destroy evidence without a court order, that he did not instruct anyone to destroy evidence, and that nobody on his staff would have destroyed evidence. Tyler D. Ct. Exhibit D at 12, 16-17. Moseley further stated that some of the evidence was moved out of the prosecutor's office due to remodeling. Id. at 13-14.

In that regard, Ruby Marsden, an investigator with the Boone County prosecutor's office, testified that in 1980 she moved a box of evidence marked with Tyler's name and case number to the Columbia Police Department in anticipation of a remodeling project at the prosecutor's office. D. Ct. Hr'g Tr. at 8-10. Although she

---

[8]The items listed as received by the prosecutor's office included one miscellaneous lot of underclothes and one hair sample. Tyler D. Ct. Exhibit A at item 1. This is consistent with the evidence listed in Land's report. Id. at item 5.

stated that she physically transferred the box to Lester Wright, the evidence technician at the Columbia Police Department, id. at 11-14, no evidence routing forms were signed by Wright or by any other employee of the Columbia Police Department. Id. at 21-23. Wright testified that he remembered receiving a large amount of evidence from the prosecutor's office in 1980, but that he had no specific recollection of receiving any evidence in Tyler's case. Id. at 36-37. He further stated that, to the best of his knowledge, he had never received instructions to destroy or dispose of evidence he received from Marsden in 1980, including any evidence from Tyler's case. Id. at 37. Yvonne Dittmer, Wright's successor until 1992, testified that she had no recollection of the presence of evidence in Tyler's case during her tenure and that she would not have destroyed it without permission from the prosecutor's office. Id. at 49-51. Searches of both the prosecutor's office and the Columbia Police Department conducted since prior to 1989 have failed to uncover any of the evidence that Tyler asserts exists. Id. at 5-8, 57-58.

Although the discrepancy between Marsden's records and her recollection may signal the presence of negligence or lax record keeping, the testimony considered by the district court contains no facts that even hint at the intentional destruction of the disputed evidence in this case. Furthermore, we do not believe that Tyler's allegation regarding the state's failure to disclose the disputed evidence has any bearing on the issue of whether the evidence was intentionally lost or destroyed. Finally, the mere fact that a set of fingerprints connected to the crime were analyzed in 1988, see id. at 77-78, sheds no light on the whereabouts of the specific evidence at issue here: semen, hair, items of clothing, and related materials. Accordingly, the district court's factual findings are not clearly erroneous.

**B.**

Tyler next claims that the actions of the state in first failing to disclose the existence of the disputed evidence and then "mysteriously" losing or destroying such evidence constituted bad faith sufficient to deprive him of due process. The district

court did not make specific conclusions of law on this issue (nor can it be faulted for doing so, given the direction in our June 20, 2000, order to enter factual findings only), but our review of the legal ramifications of the loss of the disputed evidence flows from the terms of that order. Although Tyler does not identify a specific legal framework for his argument, his claim is most properly viewed under the Supreme Court's decision in Arizona v. Youngblood. 488 U.S. at 57-58 (bad faith analysis is appropriate where the Court considered "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant"). Furthermore, because two Missouri state courts have previously considered the Youngblood issue in this case and found an absence of bad faith, see Tyler Exhibit F-4 at 766-67 (denial of first state postconviction motion), aff'd, 794 S.W.2d 252; Appellee's App. at 64-69 (denial of state motion for DNA testing), aff'd, 142 S.W.3d 785, we must give those decisions the deference mandated by AEDPA. See 28 U.S.C. § 2254(d).

Considering the record and the legal arguments raised by Tyler, we do not believe that the state courts' findings of an absence of bad faith resulted in decisions that were contrary to, or an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1). Similarly, we do not believe that such decisions were based upon unreasonable determinations of facts in light of the evidence before each court. 28 U.S.C. § 2254(d)(2).

Tyler contends that the State failed to disclose the existence of the disputed evidence prior to his state postconviction motion. His contention is belied, however, by numerous instances in the record. In a second supplemental motion for new trial, filed in the trial court shortly after his conviction, Tyler claimed as error the State's failure to disclose the "blood typing of the sperm found on panties, tissue and pantaloons taken from the alleged victim." Trial Tr. at 1156. It is difficult to imagine how Tyler could have known of the presence of sperm on any of the victim's

clothing, let alone used the specific names of the items of clothing identified in Land's report, see Tyler D. Ct. Exhibit A at item 5, if such information had not been disclosed to him. In addition, Tyler repeatedly stated in his *pro se* pleadings in his first state postconviction motion that the State had disclosed Land's report, but had not disclosed the results of her tests for semen and acid phosphatase or the manner in which she conducted the tests.[9] See Tyler Exhibit F-2 at 204-05 (while February 28, 1977, report of Land was tendered, State did not offer to test Tyler and did not disclose whether secreter testing was done on seminal fluid sample from victim's undergarments), 220 (State did not disclose results of tests performed by State Highway Patrol concerning, *inter alia*, sperm and acid phosphatase), 237 (State disclosed that acid phosphatase was found on victim's clothing, but did not disclose the type and manner of test done), 314 (State made report of Susan Land available following the February 28, 1977, finding that semen, phosphatase, and hair were found, but did not make such items available for testing). Furthermore, Tyler's assisting counsel at the trial testified in Tyler's first state postconviction motion that, in his view, everything had been disclosed to Tyler prior to the commencement of the trial. Tyler Exhibit E-2 at 216 ("I think we got everything there was to get"), 261 (assisting counsel examined some clothing of victim). Although Tyler may not have received Land's laboratory notes until some later date, such notes provided no information that was not disclosed by the report. See Tyler D. Ct. Exhibit A at item 24.

Given these facts, we believe that Tyler's case is controlled by our recent decision in Ferguson v. Roper, 400 F.3d 635 (8th Cir. 2005), in which we held that Youngblood does not apply to claims that evidence was lost or destroyed after trial. Id. at 638. Notably, we held in Ferguson that Youngblood is inapplicable even in the

---

[9]Such a claim, even if made in the alternative in this case, would similarly be insufficient to show bad faith because "the police do not have a constitutional duty to perform any particular tests." Youngblood, 488 U.S. at 59.

face of an allegation that the prosecutor may not have disclosed the evidence prior to trial. Id. If Youngblood is inapplicable in such a case, it is equally inapplicable in a case—like Tyler's—in which the existence of the evidence was disclosed prior to trial. Although we find it puzzling that the State persisted in claiming that no samples other than that discarded by Dr. See and those destroyed by neutron activation testing had been "collected," we do not believe that such conduct places this case outside of Ferguson's holding, especially in light of the fact that Tyler—who was, according to the record, in possession of Land's report—could have brought the report and its findings to the attention of the trial court. Accordingly, we hold that Tyler's Youngblood claim is without merit.

## C.

Tyler makes two additional arguments in favor of reversal. First, he contends that the district court failed to follow the en banc court's mandate by failing to order the State to produce the results of tests conducted on the hairs recovered from the victim's undergarments. This claim fails, however, because there is no evidence in the record tending to show that any tests were conducted on those hairs.

Two groups of hairs were collected in the course of the police investigation. The first group, consisting of hairs taken from the victim's couch, the victim herself, and Tyler, were consumed in neutron activation testing as stated *ante*, note 4. The second group were separated from the victim's undergarments by Land and placed in a small box. D. Ct. Hr'g Tr. at 72. Neither Land nor anyone else at the Missouri State Highway Patrol Laboratory tested the hairs, as the laboratory did not have the capability to do such testing. Tyler D. Ct. Exhibit A at item 27. The hairs were then transferred to the Columbia Police Department, and eventually to the Boone County prosecutor's office, where their trail ends. In short, there is no indication in the record that the second group of hairs was tested.

Tyler's second additional argument for reversal is that the district court should have recused itself from conducting the evidentiary hearing. Specifically, he asserts that because Judge Gaitan was a member of the Missouri Court of Appeals, Western District, at the time that Tyler made a motion for rehearing or transfer (to the Supreme Court of Missouri) of the appeal of his first state postconviction motion, Judge Gaitan was not permitted to conduct the evidentiary hearing. Because Tyler did not make a motion for recusal in the district court, his only argument is that Judge Gaitan should have recused himself *sua sponte*.

"Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The test for disqualification or recusal is an objective one and asks whether, from the perspective of "the average person on the street," a reasonable man knowing all of the circumstances "would harbor doubts about the judge's impartiality." United States v. Poludniak, 657 F.2d 948, 954 (8th Cir. 1981) (citation omitted). Missouri Supreme Court Rule 83.02 states that a case may be transferred to the Supreme Court of Missouri by order of a majority of the participating judges of the Missouri Court of Appeals on account of "the general interest or importance of a question involved in the case or for the purpose of reexamining existing law." Even accepting Tyler's submission that all judges then sitting on the Missouri Court of Appeals, Western District, ruled on his motion, we do not believe that Judge Gaitan's vote on such a motion would lead a reasonable person to harbor doubts about his impartiality because neither an opinion on the general interest or importance of an issue in a given case nor an opinion as to whether then-existing Missouri law should have been reexamined provides any basis to question a jurist's impartiality as to the merits of the case. Accordingly, we do not believe that even the "appearance of impartiality" is threatened in this case, thus requiring disqualification or recusal. Poludniak, 657 F.2d at 954. Accord Dyas v. Lockhart, 705 F.2d 993, 997-98 (8th Cir. 1983) (remanding to a different district judge where judge who rendered opinion had participated in a state court ruling on the merits of a case).

## III.

Finally, we hold that the grounds for relief presented in Tyler's *pro se* reply brief in this action are not subject to review. Tyler claims that, based upon newly discovered deposition testimony that Land could have tested the disputed evidence at the time of his trial, he is entitled to relief on his claim that the prosecution violated its duty under Brady v. Maryland, 373 U.S. 83 (1963), to disclose the existence of the disputed evidence. Because such a claim was presented, at the very least, in his second federal habeas petition, it must be dismissed. See 28 U.S.C. § 2244(b)(1) ("A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed."). Furthermore, even if Tyler's Brady claim was not presented in a prior habeas petition, it must be dismissed unless he shows that: (1) "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence"; and (2) "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense."[10] 28 U.S.C. § 2244(b)(2)(B).

Tyler's claim is not cognizable on successive habeas review because, even assuming that the evidence could have been tested, Tyler cannot show that no reasonable factfinder would have found him guilty, for we simply do not know what the results of such tests would have been. Even if correctly and successfully conducted, the tests may have excluded Tyler as the assailant or completely inculpated him. A resort to speculation regarding what, if anything, the tests would have shown, however, does not meet the requisite standard for considering claims presented in a successive habeas petition.

---

[10]Tyler does not argue that his claim relies upon any new rule of constitutional law. See 28 U.S.C. § 2244(b)(2)(A).

We affirm the findings entered by the district court pursuant to our June 20, 2000, order as not clearly erroneous. Furthermore, because there exists no basis upon which to grant habeas relief, we fully and finally dismiss Tyler's claims to the extent that they present a habeas petition.[11]

_____

[11]We express our appreciation to Tyler's appointed counsel for her zealous efforts on her client's behalf.